UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-100 (SRN/ECW)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JULYEN ALONZO MARTIN,<br><br>Defendant. | **GOVERNMENT'S POSITION WITH RESPECT TO SENTENCING** |

"Julyen kept threatening me. Telling me he was going to take our [child] and that if I call the cops, someone will die. . . . I felt very unsafe. I felt hopeless. I felt lost." (Gov. Ex. 1 at 3 (T.A.'s victim impact statement).)

Julyen Alonzo Martin is an abusive stalker who raged over losing power and control over his ex-wife T.A. His offense conduct involves serious, intentional threats of violence against T.A. and her stepfather J.L.—a man who Martin has never met. J.L. fell into Martin's crosshairs simply by marrying T.A.'s mother and being a part of their lives. In addition to direct threats of violence, Martin cyberstalked both victims causing them substantial emotional distress. Martin created fake social media accounts posing as T.A., sharing her private photos and falsely claiming she had HIV. In his whirlwind of harassment, Martin falsely claimed J.L. was a pedophile and even contacted J.L.'s employer and the National Center for Missing and Exploited Children with this baseless, harmful accusation. Martin's cyberstalking necessitates an appropriate period of incarceration.

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Hillary A. Taylor, Assistant United States Attorney, respectfully submits its position on sentencing with regard to Defendant Julyen Alonzo Martin. For the reasons set forth below, the Government submits that the appropriate sentence is the top of the guidelines 46 months' imprisonment, followed by three years of supervised release with special conditions regarding no contact with victims and electronic device monitoring. Such a sentence is sufficient, but not greater than necessary, to protect the public and address the seriousness of the offense, the history and characteristics of the defendant, the need for deterrence, and the defendant's need for appropriate mental health treatment.

I. **FACTUAL AND PROCEDURAL BACKGROUND**

    A. **Martin's Domestic Violence Towards Victim T.A. Prior to Cyberstalking Her.**

Martin and the victim T.A. were previously married and had a child together in 2017. (PSR ¶ 8.) After the birth of their child, Martin became increasingly physically, verbally, and emotionally abusive towards T.A. (*Id.* at ¶ 62.) Martin would get in T.A.'s face and scream at her. (*Id.*) He whipped her with a towel. (*Id.*) He would isolate her from her family and take away her phone so she could not call anyone for help. (*Id.*) Martin's physical abuse of T.A. escalated over time and culminated in Martin severely beating T.A. in 2019. (*Id.*; Gov. Ex. 1 at 1.) Martin grabbed T.A. by her hair and slammed her head on the ground, causing her to black out and leaving her with bruises. (PSR at ¶ 62.) Then Martin took T.A.'s cell phone, ensuring she could not call for help. (*Id.*; Gov. Ex. 1 at 1.)

2

Martin took of picture of T.A. laying on the ground and texted it to a member of T.A.'s family, in a further show of control and imposition of emotional trauma. (PSR ¶ 62.)

T.A. escaped Martin's abuse in 2019 and moved from Colorado to New York with their child to be near her family in case Martin hurt her again. (Gov. Ex. 1 at 1.) T.A. at first tried to see if Martin could seek help for his abusive actions and whether they could reconcile. (*See id.*; PSR ¶ 62.) However, Martin did not seek help, and their relationship ended. T.A. subsequently divorced Martin and received sole custody of their child. (*See* PSR ¶¶ 8, 62.)

### B. Martin Cyberstalks and Threatens His Ex-Wife T.A. After She Flees His Abuse.

After their relationship ended, from at least September 2020 through December 2021, Martin cyberstalked and threatened his ex-wife T.A with violence. (*Id.* at ¶¶ 9-11.) Martin claimed his harassment was simply because he wanted to see their child. However, Martin's messages reveal that he was also furious that T.A. left him. During this time, he wrote T.A., "all I can do is ask that you drop the divorce . . . I don't want to say 'or else' I'm just not stupid and I know where my feelings will take me/lead me to do[.]"

In his cyberstalking scheme, Martin used every tool at his disposal. Martin directly threatened T.A. countless times. By way of example of the tenor and intensity of Martin's threats—Martin messaged T.A. in June 2021, "I will f**k up your life as long as I live. Someone better come kill me right now. Before I kill somebody. You know what I wanna do. I'm tired of calling people." (Gov. Ex. 2; PSR ¶ 9.) In September 2021, Martin

3

threatened T.A., "GIVE ME MY SON OR YOUR LIFE IS OVER . . . F**k you and the b***h ass [n-word] around you. They are all dead!" (Gov. Ex. 3; PSR ¶ 9.)

Martin referred to his prior physical abuse of T.A. in his threats, and expressed regret for not causing her more physical injury when he had more immediate access to her: "[a]part of me probably did want to do way more to you I can't lie[.] And I regret not doing more to you. I should have ended everything right then and there and busted your whole grill open and went to jail[.]" (Gov. Ex. 4.) Martin threatened the safety of law enforcement and members of the justice system in his threats to T.A., which frightened her: "[j]ust know when the cops come to arrest me someone going to die"; "I hope I find dude police ass asap. I been wanting to try something on a cop"; and "I hope all your lawyers and judges die." (PSR ¶ 9; *see, e.g.*, Gov. Ex. 5.)

Martin threatened others in T.A.'s life with violence as another method to inflict emotional abuse on her from afar. Martin threatened to beat T.A.'s boyfriend to death "in front of his kids." (PSR ¶ 9 ("[boyfriend's name] family already dead. It's too late f**k dude. He getting robbed then beat to death [i]n front of his kids."); Gov. Ex. 6 (same).) Martin continued to threaten T.A. for not staying in a relationship with him, telling her "[e]very random b***h ass [n-word] you put over me is dead[.]" (*Id.*) Also, Martin threatened T.A.'s family and specifically targeted her stepfather J.L., as further detailed below. (*See infra* Section I.C.) Martin's expansive threats had their intended effect. He placed T.A. and everyone around her in fear of what he could do to them in order to continually pressure T.A. to submit to his will. In fact, in July 2021, Martin directly

4

messaged T.A.'s mother (J.L.'s wife) using a fake social media account posing as T.A., stating the following threats:

- [T.A.] is doing some stupid s**t to make me mad. Tell her to stop trying to rub everything in my face. I saw her new secret whore profile. She wants me to kill her or something? Wtf is wrong with your daughter.
  …
- She wants violence . . . . And if she keeps hiding from her problems I'm coming at all of you again…and again.
- I don't have s**t else to lose at this point right?
- Where is my son…I will destroy everyone lives [T.A.] knows until get my son.
- I do not give a f**k I will kick doors in while y'all sleeping.
- Im driving to her if she tries to kill me imma kill her first.

(PSR ¶ 13.)

Martin also used indirect harassment as a part of his stalking scheme. Martin accessed T.A.'s mother's Amazon account to learn her address. (*Id.* at ¶ 11; Gov. Ex. 1 at 3-4.) Further, Martin exploited police welfare checks and CPS reports to try to discover T.A.'s whereabouts. (PSR ¶ 62.) There was never a substantiated CPS report. Indeed, it was the officers who responded to one of Martin's reports that directed T.A. to get a restraining order. (*See* Gov. Ex. 1 at 3.) T.A. obtained two orders for protection against Martin, but Martin has made his view on those OFPs clear: "Go kill yourself. F**k your restraining order you f**king evil demon." (PSR ¶ 62; Gov. Ex. 7.)

Additionally, Martin cyberstalked T.A. by creating social media accounts posing as her to ruin her reputation and harass her. (PSR ¶ 10.) Martin used T.A.'s full name and her pictures in creating these accounts. (*Id.*) One of Martin's fake T.A. Instagram accounts stated in the profile description: "this woman has HIV" and is a "manipulative liar." (*See id.*) Another Instagram account created by Martin shared a sensitive photo of T.A., her full

5

name, and commented on a post, "[l]ook at me I'm a dirty whore. . . I'm a stupid cheating b***h who tells her [child's] dad he can't be with him because he's made that YOUR A F**KING STUPID LYING B***H!"

Ultimately, Martin's conduct was harmful and specifically designed to cause the victims anxiety and distress. T.A. was forced to shut down her online business due to Martin's stalking and messages. (*Id.* at ¶ 11.) T.A. feared for her and her family's physical safety. T.A. moved residences, changed her phone number, and lived a fairly closed-off life out of fear that Martin could show up at any moment to enact his violent threats. (*See* Gov. Ex. 1 at 3-4.)

### C. Martin Threatens to Assault and Kill J.L., and Then Stalks and Tries to Harm J.L.'s Reputation and Employment

Not satisfied to target T.A. alone, Martin also cyberstalked and threatened to assault and kill victim J.L. Martin has never met J.L. (PSR ¶ 12.) J.L. lived states away in Ohio and worked in leadership at a private school. Yet, J.L. became another of Martin's targets simply by marrying T.A.'s mother relatively recently and being a part of their lives. It appears Martin targeted J.L. so that T.A. would not only feel afraid for herself, but also would fear for the safety of a newer member of her family.

On September 14, 2020, Martin texted T.A. that he was going to beat and kill J.L. Martin indicated he was outside J.L.'s place of work at a private school, stating:

- And I'm going to beat your mom's husband's [J.L.'s] ass inside of his school. Cause believe it or not I'm in ohio right now. I've watched him go in and out the school he works at for a week. And the only reason he is still walking is because Im letting him continue to breath.
- So hurry up and answer before I run into this school and go to jail for a long time.

6

- I'm afraid he might die if I hit him too hard[.] (*Id.*)

Martin's threat did exactly what it was intended to do—it caused terror and inflicted substantial emotional distress. Both T.A. and J.L. believed Martin had travelled from Minnesota to Ohio, where J.L. lived and worked, and would imminently cause harm. Fearing for his safety and the safety of children at his school, J.L. filed a local police report in response to these threats. (*Id.* at ¶ 12-13.) Martin was subsequently charged in Ohio. (*Id.* at ¶ 53.) J.L. also obtained an order for protection against Martin in October 2020. (*Id.* at ¶ 13.)

Following this, Martin cyberstalked J.L. and engaged in a harassing course of conduct. Martin even previewed his scheme, messaging T.A., "F**k u [T.A.] watch what happens I'm coming after your fake Jew mom's husband [J.L.]. Getting his dumb ass fired." Martin followed through on this threat. Martin called the National Center for Missing and Exploited Children ("NCMEC") and falsely claimed that J.L. was using his work computer to view child pornography. (*Id.* at ¶ 12.) Martin used a fake name and phone number, however NCMEC's Automatic Number Identification system logged the reporting party's phone number as Martin's.

On October 3, 2020, J.L.'s private school workplace received an email from an account used by Martin. (*See id.*) Martin claimed to be a "private investigator" looking into J.L. for "child endangerment." (*See id.*) That same day, NCMEC received a second electronic tip message about J.L., which was affiliated with Martin via an IP address. Martin once again used a fake name and stated, "[a] man named [J.L.] at [J.L.'s private school] was suspected of having child porn on his personal computer."

7

Martin also posed as an FBI agent in furtherance of his cyberstalking scheme. (*Id.*) On October 1, 2020, Martin called J.L.'s private school and claimed the FBI had searched J.L.'s office. Then Martin called J.L.'s minor stepdaughter from his cell phone while using *67 to hide caller ID information. During the phone call, Martin claimed to be "with the FBI" and asked to speak to T.A. The next day, J.L.'s private school received three phone calls from a spoofed number (appearing to originate from its own phone number), with Martin leaving a voicemail stating he was a "Special Agent with the Federal Bureau of Investigation endangered and exploited trafficked children." Martin claimed that he and his team members had court orders to search the private school's offices for evidence. (*Id.*) Further, Martin impersonated T.A. on Instagram to post comments on J.L.'s school's Instagram page, claiming J.L. was a pedophile under FBI investigation. (*Id.*; Gov. Ex. 8.)

Martin's cyberstalking, attacks on reputation, and threats of violence against J.L. not only caused J.L. substantial emotional distress, but also caused J.L. to fear that he could lose his job. J.L.'s workplace conducted an internal investigation and hired legal counsel. An Internet Crimes Against Children ("ICAC") investigator conducted a phone interview with the school board's president regarding the pedophile/child pornography allegations. The private school's response to Martin's false allegations against J.L. cost the school roughly $22,000, per the school board president's estimates.

### D.     Martin's Conduct Post-Arrest.

On May 24, 2022, Martin was charged by Indictment with two counts of Cyberstalking, three counts of Interstate Threats, and one count of Impersonating an Officer of the United States. (ECF No. 1.) On June 24, 2022, Martin was arrested in

Arizona. (PSR ¶ 14.) While detained and being transported to Minnesota, Martin asked his family members to contact the victims to deter their participation with the case. (*Id.*) In a jail call on July 11, 2022, Martin told his sister A.M., "I don't know, get a hold of f**kin' [J.L.] and tell him to drop the damn charges. . . . I'm sure [T.A.] is very happy right now." (*Id.*) In a jail call on July 12, 2022, Martin told his brother C.M. that he "told [his sister A.M.] to message [T.A.] and her people to tell them to try to get them to drop the charges." (*Id.*) Then Martin asked his brother, "after this phone call, if you could hit [sister] up and remind her to try to do that s**t." (*Id.*) Martin's brother responds, "I got you," and goes on to note he thinks he will call their mom instead of their sister to contact T.A. (*Id.*) Martin directs his brother to contact "both, do both, because the best way would be, would be to get this s**t dropped." (*Id.*)

Martin's attempts to pressure victims continued. Martin sent six letters to T.A. while incarcerated. (*Id.*) Martin's letters shifted blame for Martin's conduct onto T.A. In a letter received by T.A. in September 2022, Martin wrote: "I really wish your mom and [J.L.] can help me out by dropping the charges, or just stop holding a grudge. I just wanted to be in [child's] life my way. People do way worse things in life." (*Id.*)[1]

E.   **The Plea, the PSR, and the Sentencing Guidelines Calculations.**

On March 15, 2023, Martin pled guilty to two counts of Cyberstalking, and the Government agreed to dismiss the remaining counts at sentencing. (ECF Nos. 58-59.) The

---

[1] The Government includes this information to provide additional background for the Court about additional emotional injuries the victims experienced in this case. However, the PSR correctly notes that the Government does not pursue an obstruction of justice enhancement. (*See* PSR ¶ 18.)

9

final Presentence Report was issued on July 21, 2023. (ECF No. 71.)

The Government agrees with the Guidelines calculations set forth in the Presentence Report. The PSR finds a total adjusted offense level of 21, a criminal history category of I, and a Guidelines imprisonment range of 37 to 46 months. (PSR ¶ 106.) This range does not differ from that which was contemplated by the parties in the plea agreement. (*Id.* at ¶ 108.) There are no outstanding contested issues from the PSR calculations.

While Martin agreed to mandatory restitution in his plea agreement (ECF No. 59 at ¶ 12), the victims have decided not to request restitution. Thus, there is no outstanding restitution issue to be resolved at sentencing.

## II. THE GOVERNMENT'S SENTENCING RECOMMENDATION

The Court employs the U.S. Sentencing Guidelines as "the starting point and the initial benchmark" in imposing its sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). Although the Guidelines are advisory, the Court must "remain cognizant of them throughout the sentencing process." *Id.* at 50 n.6. Indeed, a court may "'rest [its] decision upon the Commission's own reasoning that the Guidelines sentence is a proper sentence (in terms of § 3553(a) and other congressional mandates) in the typical case' if the court finds that the case before it is typical." *United States v. Robinson*, 516 F.3d 716, 718 (8th Cir. 2008) (quoting *Rita v. United States*, 551 U.S. 338, 357 (2007)). In addition to considering the Guidelines, § 3553(a) requires the Court to analyze a number of factors, including the nature and circumstances of the offense, the history and circumstances of the defendant, the need for the sentence to reflect the seriousness of the offense, the need for

deterrence, the need to protect the public from further crimes of the defendant, and the need to avoid unwarranted disparities. 18 U.S.C. § 3553(a).

The United States respectfully recommends a sentence of 46 months' imprisonment, followed by three years of supervised release. The recommended sentence seeks to balance the seriousness of the offense and the clear needs for deterrence and to protect the public, while also considering Martin's criminal history and characteristics, as further described below.

A. **The Nature and Circumstances of the Offense, the Seriousness of the Offense, and Protecting the Public.**

The nature and circumstances of Martin's egregious conduct weigh heavily in favor of the Government's requested sentence. There is a real and significant connection between stalking and violent conduct. Cyberstalking, like offline stalking, is a serious offense that that often leads to violent conduct. *See* Kris Mohandie et al., *The RECON Typology of Stalking: Reliability and Validity Based Upon a Large Sample of North American Stalkers*, 51 J. of Forensic Sci. 147, 152 (2006) ("[V]iolence is ubiquitous in stalking cases."); U.S. Dep't of Justice, *Cyberstalking: A New Challenge for Law Enforcement and Industry*, at https://webharvest.gov/peth04/20041022072652/http://www.usdoj.gov/criminal/cybercrime/cyberstalking.htm (Aug. 1999) [hereinafter *DOJ Report on Cyberstalking*]. Importantly, cyberstalking is not a more benign version of offline stalking. Both offline and online stalkers will escalate the frequency and intensity of their pursuit over time, which can often lead to physical violence. *See* Mohandie et al., *supra*, at 153; *DOJ Report on Cyberstalking*. One-third of stalkers will assault their victim and almost half will engage

11

in some sort of violence against a person or property in the course of stalking their victim. *See* Mohandie et al., *supra*, at 152; *see also* SPARC, Stalking and Intimate Partner Violence: Fact Sheet, https://www.stalkingawareness.org/wp-content/uploads/2018/11/Stalking-IPV-Fact-Sheet.pdf (last accessed Sept. 11, 2023).

As noted above, Martin's cyberstalking campaigns were remarkable for how extensive, persistent, and pernicious they were and for the devastating pain and trauma he willfully inflicted on the victims. Martin's motives for doing so were plain. He believed T.A. had wronged him by leaving his abuse for safety with their child, and wronged him by moving on (or in his words, putting others "over [him]"). (*See* Gov. Ex. 6.) Presumably, in Martin's mind, his attacks on T.A. and J.L. were justified payback.

When Martin's harassment did not have the desired effect (*e.g.*, T.A. agreeing to go back to him with their child), his messages and cyberstalking became more offensive. He contacted T.A.'s family members with threats and demeaning statements about her. Martin continued to threaten violence against T.A. He messaged that he would rape T.A.'s aunt violently (*see* Gov. Ex. 1 at 3), or that he would rob and then "beat to death" T.A.'s boyfriend "[i]n front of his kids." (Gov. Ex. 6.) Martin told one of T.A.'s cousins to slit their wrist, knowing they had suicidal ideation. (Gov. Ex. 1 at 3.) Indeed, Martin directed vitriol at others in T.A.'s life, appearing to take pleasure in tormenting her. (Gov. Ex. 9 ("Im about to open a credit card in your name so you can pay for your legal bills. Say hello to cps and ins [T.A.]…. Lol . . . Is it funny?? [laughing emojis].")

Moreover, Martin unquestionably knew what he was doing was not only harmful, but also illegal. (Gov. Ex. 5.) Martin posed as T.A. online and made harmful statements

about her in an attempt to ruin her reputation. When cyberstalking J.L., Martin used a fake name to submit the false allegations about him to NCMEC and J.L.'s workplace. Martin even posed as a federal law enforcement officer in furtherance of his harassment. Martin's conduct demonstrates a disturbing and escalating pattern of stalking designed to inflict damage on every aspect of the victims' lives.

As intended, his stalking and threats caused T.A. and J.L. substantial emotional distress. T.A. shared for the Court in her victim impact statement that she "felt scared, paranoid and anxious" because of Martin's cyberstalking. (Gov. Ex. 1 at 4.) Martin's cycle of abuse continues to make T.A. feel as if she is some part of the blame, which is part of the trauma. *See* Karen M. Abrams, MD, et al., *Comprehensive Treatment of Stalking Victims*, *25 Psych. Times* (2008), available at https://www.psychiatrictimes.com/view/comprehensive-treatment-stalking-victims (last accessed Sept. 11, 2023). Both T.A. and J.L. changed the patterns of their lives, contacted law enforcement, and obtained orders for protection in response to Martin's conduct.

It cannot be understated how dangerous Martin's criminal conduct was in this case. In light of the duration of the stalking, the multiple victims, the pernicious nature of Martin's threats, and the significant harm Martin intentionally inflicted on the victims, a sentence below the advisory Guidelines is inappropriate in this case. No less than 46 months is necessary to address the seriousness of Martin's offenses and to protect the victims in this case.

**B.     Martin's Criminal History and Characteristics, and the Need for Appropriate Treatment.**

Martin's history and characteristics present both mitigating and aggravating circumstances, meriting a sentence at the high end of the guidelines range. While Martin has no criminal history points, it is disquieting that his current encounter with the criminal justice system comes from being caught in a long pattern of cyberstalking behavior that has victims in two different states. And this pattern was no mistake. Martin has threatened others with violence when they dared to not defer to his will before. In one prior instance, he faced no repercussions.

In January 2021, Martin made terroristic threats at his workplace that was referred by law enforcement to the City Attorney's Office for prosecution. (*See* PSR ¶ 90.) After Martin was terminated as a parking valet for the University of Minnesota health system's parking contractor, Martin repeatedly called, texted, and emailed his former coworkers with threats of violence. (*See id.*) According to University police reports, on January 15, 2021, Martin was reported to police for hiding behind a former coworker's vehicle and chasing a former coworker on foot through the parking lot. A few days later, Martin called and threatened three employees and told a supervisor that he was going to "get the staff, one by one." Martin then called the police with a threat against his former workplace, claiming to be on site and telling them to "watch what's about to happen." The responding officers treated Martin's threats as an active shooter/imminent threat situation and attempted to locate Martin without success. Although Martin was never criminally charged,

14

in response to his threats of violence, the valet service made several police reports and changed staffing procedures in fear that Martin would follow through on his threats.

Within this pattern, the Government does not dispute that Martin may be facing challenges due to his mental health. (*See* PSR ¶¶ 73-75.) Martin also reports growing up in a home where he witnessed domestic violence and where drugs and alcohol were abused. (*Id.* at ¶ 78.) However, Martin knew the difference between right and wrong and was fully aware that he was hurting others. He also knew that he was committing serious crimes and facing the possibility of imprisonment. Even if Martin's family history and mental health issues are taken into consideration, they should not be used as a shield to allow him to avoid taking responsibility for his deliberate and violent actions. They also cannot justify his conduct, nor lessen the trauma that the victims experienced as a result of his ongoing harassment.

      C.    **The Need to Afford Adequate Deterrence and Promote Respect for the Law.**

There is a substantial need for specific deterrence in this case. For a long period of time, Martin felt empowered to harass and stalk his ex-wife T.A. simply because she fled their abusive relationship with their child. Martin has consistently shifted blame and minimized his conduct. Martin even used the legal system to harass T.A., through police welfare checks and CPS reports. Further, Martin violated orders for protection throughout his cyberstalking scheme. When reminded of that fact, Martin texted T.A., "F**k your restraining order you f**king evil demon." (PSR ¶ 62; Gov. Ex. 7.) An appropriate federal

sentence coupled with treatment will hopefully deter him from similar conduct in the future.

Independently, there is also a substantial need for general deterrence. Incidents of stalking are underreported for several reasons. Victims have reported the perception that stalking did not seem to be a severe enough crime to justify law enforcement intervention, and that police could not or would not do anything to make it stop. Cyberstalking in particular can be difficult to investigate, especially where the defendant hides their identity through using generated phone numbers and different IP addresses. Imposing a serious sentence in this case would show victims that the justice system understands the gravity of their circumstances and can help. A sentence of on the high end of the guidelines of 46 months will show this defendant—and others so inclined—that they cannot cyberstalk victims without significant consequences.

### III. CONCLUSION

For the foregoing reasons, the United States respectfully recommends that the Court sentence Julyen Alonzo Martin to a 46-month term of imprisonment, followed by three years of supervised release with special conditions regarding no contact with victims and electronic device monitoring.

Dated: September 11, 2023               Respectfully submitted,

                                        ANDREW M. LUGER
                                        United States Attorney

                                        *s/ Hillary A. Taylor*
                                        BY: HILLARY A. TAYLOR
                                        Assistant United States Attorney
                                        Attorney ID No. 0398557